Fowler v. AT&T  That is far from our case. Mr. Gaige and I, I am wrestling with how. It can not be adverse. When a person is placed into a pool and notified of that. That their job is effectively no longer secure. That is to say that there is now a possibility that we can't quantify at this point, but a possibility that they will lose that job. Why is that not adverse? Your Honor, I think that is potentially adverse and we have to wait for the facts to play out to find out whether that. So your entire, so your position is the adverse nature of any kind of employment action or decision is based upon the ultimate result. It cannot be in the initial determination to place a person in this pool of surplus. Your Honor, I think the question around the initial determination is whether it is motivated by a protected characteristic. Whether the result of that determination is adverse adversely impacts the person depends upon the facts. And again, in my hypothetical, if someone is told you are being surplused and the next day, the company decides because someone died on the team, they no longer need to eliminate that person's job. Your Honor, we submit that should not be actionable under the statutes. But the EEOC is focusing on the terms of the statute where it says, and it seems to be plausible because the statutes prohibit discrimination, not just in termination, but also in terms, conditions, and privileges of employment. Close quote, that's 42 USC 1211, 1112A and 29 USC 623A1. How do I get around the text? Your Honor, we believe that simply telling someone that their job may go away in the future should not be actionable as a change in the conditions or terms of their employment, unless it actually happens. And those terms and conditions do change in the future. The conversation in which someone is told this may happen in the future, the conversation we submit is not a change in the terms and conditions of the employee's employment. Your Honor, we don't think you even need to get to this. Because the plaintiff concedes in her brief that she needs to show that determination occurred under circumstances giving rise to an inference of discrimination. And it simply did not. And I'd like to address a few of what we think are baseless claims by Ms. Fowler that AT&T misrepresented the facts or lied about the surplus selection or misrepresented the identity of the decision maker. First, contrary to Ms. Fowler's argument, there is no genuine issue regarding the elimination of the 17 positions in the first surplus. Didn't Ms. Dela Cruz say that her job was not actually eliminated? She did not, Your Honor. Ms. Dela Cruz's testimony in that part of her deposition, she was simply talking about how she was going to be reallocating resources among the remaining members of the team. The evidence that we put forth in the record shows undeniably that 17 jobs were eliminated. And Ms. Dela Cruz's testimony about how they were going to do the work going forward and reallocating responsibilities does not contradict that. It certainly doesn't create any genuine issue as to that, Your Honor. Similarly, Ms. Eastwood's testimony about the ratings. Ms. Fowler contends that simply because three years later she couldn't remember the specific reasons justifying her contemporaneously recorded ratings of her team, that that creates an issue of fact. And we submit it does not. Because if you look at that testimony, you can see that whenever she was asked why she didn't know, she said she couldn't remember. And a witness's failed memory hardly creates a question of fact around contemporaneously recorded ratings. But if that's the case, then, because these suits will always come to the deposition or to trial at some period of time after the event. So all the employee has to do is say, I don't remember why I could. I don't remember. And the fact finder cannot read anything into the fact that the failed memory may be a suggestion that the ratings were not based upon a good, good faith evaluation of the employee. Your Honor, Your Honor, I think in front is this this court specifically said the fact that someone doesn't remember those kinds of specifics does not create a genuine issue of fact. And if you look at Ms. Eastwood's testimony, she was being asked three years later what the reasons were for particular ratings on different categories for many people. The fact that she doesn't remember those particulars and the fact that when asked why she couldn't remember, she simply said, I can't remember that. That does not create certainly is not sufficient evidence to give rise to inference of discrimination. Next, Ms. Fowler argues that she was somehow targeted. Now, first of all, there's nothing in the record whatsoever to suggest that she was targeted, if you will, because of any protected characteristic. First, the surplus guidelines in the record, appendix page 822 in the surplus guidelines under the heading determined scope of initiative. The following question is posed, quote, will the effort target specific levels, titles, functions, locations, or other segments of the organizations. So the use of that word should not suggest any inference of discrimination. Second, the fact that leadership in the organization was evaluating how it would get necessary work done with fewer people, and they discussed critically what work could be reduced. And the testimony is clear, both from Ms. Arruva and Mr. Morella, that the ND 360 work and the ABM work was minimal work. There wasn't much of it. It was declining. And therefore, it was something they could get rid of. And Ms. Fowler was the one that was doing that. And so that does not give rise to an inference that they were picking her because of her age or a disability. Next, as your honors have pointed out, generally, all of the evidence shows that Ms. Fowler practically shouted from the rooftops to her boss, her boss's boss, and her boss's boss's boss from the day after she started in this job that she didn't want the job and that she couldn't do the job. Finally, HR stepped in and said, you need to rate these people. You need to put all of these people together in an effective work group and rate them. So now let's talk about the ratings. Ms. Arruva undeniably did those ratings. She undeniably did those. When she was asked in her deposition, she was shown an exhibit. You can see it referenced in the record P35. She was shown an exhibit. She said those were hers. She did them. She also said they were from the MESA system. What's the MESA system? The MESA system is the Mechanized Employee Surplus Administration System, which Ms. Fowler's counsel knows full well is the system used for the surplus. Then Ms. Fowler's counsel asked Ms. Arruva a leading question. Quote, and the system you're referring to is Amplify? Ms. Arruva's response, in 2016, we were using MESA. So it is undisputed. It is undeniable. And the ratings that we submitted in support of the summary judgment motion are attributed to Ms. Arruva. She was unclear in her deposition testimony as to what they were, whether they were mid-year or annual. And that's what she said. So it is disingenuous for Ms. Fowler to somehow say that she wasn't the rater. And, indeed, today, Mr. Farrell specifically characterized Ms. Arruva as the sole decision maker. Now, let's briefly talk about Ms. Fowler's performance as the senior systems engineer. She refused to do much of the work. She wouldn't do HALO. She only did certain types of work. The evidence undeniably shows that Ms. Arruva was patient. She got her assistance. She was not disciplining her. The CAF was a plan to help her get up to speed. But it is undisputed that the rest of the people on Ms. Arruva's team were spending 90 to 100 percent of their time on HALO projects. And that's at pages 496 and 497. So... After the CAF, how much time was she spending on HALO? According to Ms. Arruva's testimony, I believe she said it was probably 5 to 10 hours a week of work. After the CAF? Your Honor, I don't think the testimony is specific to that time frame. But it was that she was doing about 5 to 10 hours worth of work. And that was the estimate of about how much of that work actually existed. So, I'd like to briefly address, Your Honors, the failure to accommodate claim to. AT&T undisputedly engaged in good faith in the interactive process. Ms. Fowler and her doctors undisputedly were responsible for significant delays. As of August 10th, nearly three months after Ms. Fowler was first told, someone suggested to her, go to the Integrated Disability Service Center with your health issues. Three months later, one of her doctors said he had nothing to offer in terms of specifics of an accommodation. And it was only later that her other doctor said, give her 1.5, one and a half the amount of time to do the work. And admittedly, the IDSC said that generally, we can't lower expectations. So, can you give us more? They asked for more information from her doctors. They came back with nothing. And again, it's undisputed that Ms. Fowler was given plenty of time to do her work. They gave her less work. So, this case is very similar, your honors, I would say, to the Sessoms case. Sessoms versus Trustees of the University of Pennsylvania. There, the plaintiff suffered mental and physical disabilities. She had performance issues. She attributed those to her disabilities, including memory loss, like Ms. Fowler. Ms. Sessoms' supervisor was even less, was less sympathetic than Ms. Fowler's supervisor. She even said, as that decision shows, that Ms. Sessoms, told Ms. Sessoms that her medical issues were irrelevant. And she didn't care about them. Ms. Sessoms clearly wanted another job. She, at her doctor's suggestions, asked for an accommodation. The company gave her part-time work. They helped her, but they said they wouldn't give her another job. Summary judgment was granted, and this court affirmed. Can I go back to the issue of adverse employment action? The Supreme Court in Ricks, which was a case from the Third Circuit, said that telling somebody that they were going to be terminated within a year exactly began the day you got the notice. We followed suit in Watson in 2000, saying that if somebody at Kodak was allowed to remain beyond a particular date, only if he was successful in obtaining another position, the statute of limitations began when you got the notice. It would seem that you, if we follow what you're suggesting, under Ricks and Watson, you could have somebody not have a substantive action until after the statute of limitations had expired. And then why don't we just extend Ricks and the Watson case, similar to what the D.C. Circuit's done in Singletary, and the Second Circuit's done in Schultz? Well, Your Honor, first, I guess I would say in the Schultz case, the Second Circuit very clearly said that that decision was limited to the facts in that case. There, it was, and also procedurally, it was a different posture. That was a Rule 12b6 motion. Let's forget Singletary and Schultz for the second. Let's go back. What about the consequences of following your path in light of Ricks and Watson, that a statute of limitations begins the day you're given the notice that you could potentially be terminated? But, Your Honor, I think that we're not asking this court to change that rule. You are told you are being fired. The clock starts running on your 300 days. We don't dispute that. Does it present a problematic circumstance for someone who's told you're going to be terminated 310 days from now, whether they file a charge? I think under those facts, they have to talk to their lawyer. I would advise them to file a charge, given Hicks, given Ricks. But I don't think this case, the facts in this case, present Your Honors with the opportunity to wrestle with this specific issue, because Ms. Fowler looked for a job. She found two jobs, and she picked one of them. And her pay didn't change. Her benefits didn't change. And she didn't present evidence in the record that there was any adverse consequence to her by taking this job. And we submit that on summary judgment, it is her burden to do that. So what you're suggesting is that in this type of situation, this sticky situation, we just wait till there's somebody that goes to 310 days, and we deal with it then. But what's the problem with dealing with it now? If Your Honors choose to address the question, there is nothing wrong with Your Honors addressing it now. I just think that Judge Shipp's decision was supported by this record. I will candidly agree, this is an interesting academic question that is more starkly presented in the transfer and refusal to transfer context. But that's similar to this. And the courts that have wrestled with that, including the D.C. Circuit in Ortiz-Diaz and in Chambers, they looked for that evidence. And again, in Chambers, summary judgment was affirmed by the D.C. Circuit. Respectfully, in the employment setting, I really think that this is more than an academic exercise. It involves someone's job and at least the probability of someone's retaining that job over the longer term. But academic, practical, or both, the panel will wrestle with it. And we've extended both sides more than the time they've been allotted, but there is rebuttal that Mr. Farrell has requested. So we'll turn the matter over to Mr. Farrell to present his rebuttal. Thank you, Your Honor. Thank you, everyone, for your time today. I want to start by addressing the issue of Ms. Aruba's testimony that Mr. Gage claims it's undisputed that she was mistaken and that she was really referring to surplus assessments, not end-of-year ratings. That's simply untrue. It's untrue based on the clarity of her testimony. But the more important point is that this court cannot come to the determination that Ms. Aruba made a mistake based upon the clarity of her testimony in her saying, I didn't do the surplus assessments. That is a jury question. The jury should be able to decide whether or not she did make a mistake. And if she testifies at trial that, now, you know what, these were actually the surplus ratings, well, then she's going to be impeached by her own sworn testimony in which she said, and I quote, Do you see how Fowler requests information used for surplus? Yes. Do you see how she makes that request? No. Did you provide her that information? No. Why not? I'm not the one who did the assessment to include her. Do you know who is? I don't. Her testimony could not be clear. The court cannot conclude under Rule 56 that it was a mistake. And one final point on this issue. Ms. Aruba submitted an errata sheet following her deposition. It is in the record at Appendix 2380 to 2382. She corrected a number of mistakes in her testimony. She did not correct this testimony. Very briefly on the issue of targeting. I direct Your Honor's attention to the testimony of the 30B6 witness, the very witness that AT&T designated to testify about the surplus guidelines. I cited it verbatim in the required brief. She quite simply and clearly says she's never heard of the term target employee. A preselection, a preliminary identification of employee violates the guidelines, not only the guidelines, but also the code of conduct. And I also direct Your Honor's attention to the testimony of the other human resources business partner in this case, a woman named Terry McGovern, who was responsible for the HR functions related to the second surplus. She was so taken aback by this issue about targeting that she testified she would have slapped Mr. Ty Rollins had she known that he was preselected. It is a disturbing procedural violation that they cannot get around. If we hold that Ms. Fowler was not qualified for her new position, doesn't that bar her failure to accommodate claim as a matter of law? Well, it depends on what aspect of the qualification analysis Your Honor is referring to under McDonnell Douglas, because under the ADA, it is a two part test. She must show up, she must show objective qualification, and then she must show that she was otherwise qualified to perform the essential functions of the job with or without accommodation at the time of the challenge adverse employment action. That's the second component. And the second component of that analysis requires the court to analyze the failure to accommodate claim. Because if the court concludes that Ms. Fowler presented a triable issue of fact as the failure to accommodate claim, then she is qualified for purposes of the McDonnell Douglas test because she is an individual who can perform the functions with accommodation. All right. Thank you. We will be on the time allotted for rebuttal. But we thank all of counsel, Mr. Farrell, Mr. Gage and Mr. Horowitz on behalf of the EEOC. The panel will take the matter under advisement and I will ask Mr. Kane to adjourn the proceedings.